This case is number 2440323 Aramark Services v. Aetna and, you know, you don't have to worry about it, it's just a matter of time before everyone's settled. Mr. McLeod. Thank you, Your Honor, and may it please the Court, Charles McLeod of Williams and Connolly on behalf of Aetna. The district court committed three fundamental and independent errors in the decision below. First, the court failed to honor the party's arbitration agreement. There's no dispute that Aramark agreed to arbitrate at least some controversies and claims between the parties that arise out of the master services agreement. There's also no dispute that under the AAA rules, which the MSA incorporates, the arbitrator, not the court, is empowered to decide which of those controversies and claims are arbitrable. Aramark argues that its current claims seek equitable relief and not legal relief, but that's exactly the sort of arbitrability controversy that the parties agreed would be resolved by arbitration in Connecticut, not litigation in Texas. Second, assuming the district court was empowered to decide the arbitrability of Aramark's claims, the court erred by classifying Aramark's requested relief as equitable. Aramark's complaint asked for, quote, any and all losses resulting from, close quote, Aetna's alleged conduct. That's classic legal relief that the parties agreed to arbitrate. Aramark and the district court are wrong that dicta in the Supreme Court's Amara decision changes the analysis. As the Supreme Court later explained in Montanil and the Fourth Circuit recently affirmed in Rose, Amara's dicta does not mean that money damages are equitable just because they're sought against a purported fiduciary. This court should follow the Fourth Circuit's reasoning and avoid creating a clear circuit conflict. Finally, the district court was wrong to deny Aetna's request for a discretionary stay that was separate from her request for a mandatory stay under Section 3 of the FAA. The district court never analyzed our discretionary request at all, and to the extent the district court implicitly rejected Aetna's request based on the first file rule, that was clear legal error and an abuse of discretion. Unless the court has questions on other issues, I'd like to start with the arbitrability question. And I think it's important to set the background framework here. The FAA has a strong presumption in favor of arbitration. Parties are entitled to give the arbitrator authority not only to resolve cases and controversies, as the parties clearly did here, but also to resolve disputes over whether to arbitrate or not. And this court, in the Petrofac decision from 2012, said that the incorporation of the AAA rules is clear and unmistakable evidence that the parties have agreed to arbitrate the question of arbitrability. The parties in this agreement, under the MSA, incorporated the AAA rules. And so — JUSTICE SOTOMAYOR Let me ask you a question about this master services agreement. Is this arbitration clause the same wording that Aetna would have in the plan documents for any beneficiary of the welfare plan? MR. CLEMENT I don't know the answer to that question, Your Honor. This MSA is between the plan sponsor —  MR. CLEMENT — Aramark and Aetna. JUSTICE SOTOMAYOR And doesn't it — and I don't have a copy of the plan, so I neglected to bring that. But the — that master services agreement refers to Aramark as the customer, does it not? MR. CLEMENT It does, Your Honor. JUSTICE SOTOMAYOR Why is this a fiduciary situation at all, as opposed to pure breach of contract? MR. CLEMENT That's exactly our position, Your Honor. This is not a fiduciary — JUSTICE SOTOMAYOR No, wait a minute. No, wait a minute. Because, I mean, Judge Gilstrap says it, and I think it's said in the briefs, both parties are, quote, fiduciaries. And the assumption is that Aetna is a fiduciary to Aramark. MR. CLEMENT And that is an incorrect assumption on the part of the district court. So it is true that there is — JUSTICE SOTOMAYOR I missed where — I thought Aetna was — I know you were talking about equitable relief. I did not think Aetna was challenging whether it is a fiduciary vis-a-vis Aramark. MR. CLEMENT We do challenge that, and that's one of the raised in the arbitration. It's true there is a limited fiduciary duty. This is in the sealed ROA at 525. It lays out Aetna's fiduciary responsibilities, and it says for a limited purpose. I won't get into exactly what that purpose is because of the confidentiality restrictions, but you can see it again at 525 of the ROA. So for one limited purpose, Aetna is a fiduciary. And the issue in this case is that the allegations do not relate to that limited purpose. So Aramark is arguing that Aetna is a fiduciary, it had all these fiduciary obligations, when in fact, as Your Honor's question suggested, at bottom what they are really arguing is a pure breach of contract. JUSTICE SOTOMAYOR Well, if that were really — I mean, I personally thought that could be very important, but you didn't distinguish the Henry Schein case in terms of that, which was just a standard, you know, manufacturer-distributor or something like that. And that's right. That's because in the Henry Schein case, there was no language about fiduciary relationships in the arbitration provision. I think the relevant distinction over the provision in Henry Schein, first, is that unlike the provision in Henry Schein, this provision gives the arbitrator authority to resolve all controversies and claims. In the Henry Schein agreement, the Court noted that the provision was somewhat unusual because it carved out entire sets of actions seeking injunctive relief and also disputes related to trademarks and other categories. And so the Court said it's true the parties in Henry Schein have incorporated the AAA rules, and that's a clear and unmistakable delegation to the arbitrator of arbitrability, but this unusual language about actions and particular disputes being carved out created some question in the Court's mind about whether the parties actually wanted arbitrability to be decided by the arbitrator. It's very different from the language here. The language here gives all controversies and claims to the arbitrator and then just limits the arbitrator's ability to award certain kinds of relief. The other significant textual distinction between this provision and the provision in Henry Schein is that this provision is paired with another sentence in the Arbitration Clause that says the arbitrator can only reward monetary relief. And as we pointed out in the briefing, that's a very significant provision because it shows the arbitrator gets to decide whether certain relief is monetary or not. But that is just the flip side of deciding the question that the parties here should have sent to the arbitrator, which is, is the relief that Aramark wants equitable or is it legal and monetary? And so it makes no sense to say a court has to make that determination at the threshold, but then the arbitrator makes that determination at the back end. It's the same question, and in our view, that question has been delegated to the arbitrator clearly and unmistakably. So for all those reasons, we think that the language of Henry Schein is different. There's no need for the Court to overrule Henry Schein or cast doubt on Henry Schein to rule for us in this case. You can simply say Henry Schein involved a very different provision. I think the problem with the district court is the district court understood Henry Schein to suggest that any time there is a carve-out in a delegation provision, that automatically makes it unclear. And that simply can't be the correct reading of Henry Schein. As we pointed out, it is very common for arbitration provisions to have some sort of carve-out on their scope. For example, the standard clause the AAA recommends parties use talks about agreements or disputes or controversies arising out of the agreement. Well —  This Court issued a decision recently, which I know about because I wrote it, saying that the AAA rules allowed the party — allowed the arbitrator to do a class action. Exactly. The AAA rules — Which is quite shocking to me, but that's the way the law seemed to — seemed to filter out. So — so great is the push toward arbitration. Exactly. There's a strong presumption the AAA rules vest the arbitrator with vast default authority. And so what the court — what the parties here did was surgically remove some of that authority to say that with respect to certain kinds of relief, at the end of the arbitration, the arbitrator would not have the authority, for example, to issue a permanent injunction. You'd have to go to court after the arbitration concludes to get that relief. But that is the way the carve-out here works. And again, that's very different from the carve-out in the Henry Schein case, which accepted whole actions and claims from the scope of the arbitrator's authority. So, for all those reasons, we think the district court was wrong to conclude that there was no clear and unmistakable delegation to the arbitrator. Turning to the question of whether the claims are equitable or illegal or not, we think the district court erred there as well. The Supreme Court has made clear in a number of cases, starting in Mertens, continuing through Great West, and most recently in Montanile, that if parties seek classic legal relief, like money damages, that is not equitable relief. The Supreme Court applies a test that looks at what was typically available in courts of equity. And typically, courts of equity could not award money damages of the sort that Aramark is seeking in this case. I think the district court got confused because of this dicta in the Amara decision. JUSTICE KENNEDY Dicta by whom? MR. GOLDSMITH Dicta by the Supreme Court.  Supreme Court of the United States?  MR. GOLDSMITH That's right, Your Honor.  Four pages of dicta? Would that be the specific issue? It may be 10 pages, I don't know.  It is.  Keep going. Keep going.  I agree, Your Honor. It is a lengthy discussion. Justice Scalia's dissent has what I thought was sort of a humorous discussion, saying, well, why are we going into such detail when this is clearly irrelevant to the disposition of the case?  But the dissent in the majority went facetiously, illusory, in writing, in all that detail.  I think that the majority thought that there would be value in providing some additional  It was an open issue that the district judge said he was interested in or she was interested in. Exactly, Your Honor. And the problem is courts, including this court in the Geralds decision, then interpreted that dicta to suggest the Supreme Court was changing the way it evaluates whether something is equitable or legal. The McCravey decision from the Fourth Circuit called this a surprising development. This court in Geralds said, well, it's clear that under our prior precedent, the Amschewan decision that Judge Jones wrote, it's clear that the relief of make-whole damages would be considered legal. But it seems like the Supreme Court is shifting at a different direction. And that's why Montanile is so critical, because Montanile makes clear, both in the footnote 3, but also in the surrounding discussion, that the test remains whether the relief was typically available in equity. Well, counsel, it seems to me your opening response to Judge Jones is to say this is not a fiduciary claim anyway, because Aramark is not a fiduciary in anything other than a very limited way with Aetna. Aetna is not a fiduciary. I just looked through the brief, and I did not see where that argument was made other than in a very preliminary way and not developed. Doesn't that argument equally apply here, that we're not even talking about a fiduciary claim? It would apply. Not because it's outside what traditional equitable relief is, but there's no fiduciary duty in the first place. And that is exactly— And that's not what you briefed. We didn't brief that because of the procedural posture of the case. So they filed their complaint. We filed our motion to stay in the district court. And so we didn't have the opportunity to engage with these facts, because we have to accept, for purposes of this motion, their factual allegations. So if we go to arbitration, we will vigorously dispute their allegation that we are a fiduciary. I think the Court doesn't have to get into that, because the Court can assume, for purposes of the question that Your Honor and I are discussing, that we are a fiduciary. And our bottom line is, Montanile makes very clear that a party's status as a fiduciary does not change the analysis. Montanile— On the issue of it not being a fiduciary here that may exist for later, we don't consider. If we disagree with you on the current status of—and you pronounce it Gerald's. It's not spelled that way, but whatever you want to say. I can call it Gerald's, Your Honor. We'll call it Gerald's, because I don't know what else to call it. If we think that still is the law, we apply it. If Your Honor thinks that you are still bound by Gerald's, I agree you would have to apply it. I think that you are not bound. What we're asking you to do is exactly the same thing that the Court actually did in Gerald's, to say there is a later intervening Supreme Court decision that casts doubt on our prior precedent. It's pretty unequivocal. In footnote 3, the Board interprets Amara as all but overruling Mertens v. Hewitt and Great Life v. Knudsen in favor of the Board's broad interpretation of equitable relief. But Cigna reaffirmed that, traditionally speaking, relief that sought a lean or constructive trust was legal, not equitable, blah, blah, blah, except for peculiar funds in any event that a discussion was not essential, and our interpretation of equitable relief in Mertens, Great Wist, Sereboff is unchanged. And that's an 8-to-1 decision. Exactly, Your Honor. And I think that's very significant, because Gerald's thought that Amara had changed the law, and Montanile makes very clear in the language you just read that no, the law has not changed. The test remains whether the relief was typically available in equity. And as I understand Aramark's position, they are not making any argument that if you apply that test, the typically available in equity test, that this relief would be legal. Their position is you don't apply that test because Amara controls, the dicta from Amara controls. And we think that that's incorrect in light of Montanile. And that's exactly the analysis the Fourth Circuit did in the Rose case. It, like this Court, had precedent suggesting that Amara had changed the law. But in Rose, the Court went through the language that Judge Jones just quoted from Montanile, looked at the precedents, and said the only way to reconcile these precedents is to say the test remains unchanged. The test is, was the relief typically available in equity? And under that test, what Aramark is seeking is a classic form of money damages, which is a prototypical legal remedy, not an equitable remedy. So we think the district court erred on that issue as well. And finally, very briefly on the discretionary stay. As we noted in our brief, the district court simply appears not to have recognized that we made this separate request. We did make it. I think very clearly our motion is in the record ROA 370. And you can see at ROA 388 through 89, we have a separate section that asks for a discretionary stay. What exactly do you think we should do? I think the court should reverse and direct the court, the district court, to enter a stay pending arbitration. A stay pending arbitration? That's right, Your Honor. And we will then go to the District of Connecticut, where we filed our petition to compel arbitration. That court, Judge Underhill, said he would grant our petition were it not for the pending Texas proceeding. So we think we should go back to Connecticut once a stay is entered. And ultimately, the relief you're seeking is to get back to Connecticut. It is reversal of the decision below. I understand. Thank you. All right. Thank you. You have time for rebuttal. Mr. Corey. At least it's not strips and gores, huh? I wouldn't know where to start with strips and gores. Good morning, Your Honor. May it please the Court. John Corey on behalf of the appellees. I want to address the fiduciary question first. Aetna has not contested that it is a fiduciary here. Well, I don't care whether it's contested or not. Is it or not, legally? Well, and I'm telling Your Honor why. And so I'm looking at page 525 of the Record on Appeal, and there's an explicit delegation in the contract to Aetna to act as a fiduciary for purposes of taking Aramark's money and deciding how much doctors and hospitals are going to be paid. And it reads, therefore, and to the extent not already implied as a discretionary authority to determine entitlement to benefits under the applicable plan documents for each claim received, including discretionary authority to determine and evaluate facts and evidence, and discretionary authority to construe the terms of the plan. Well— The exercise of discretionary authority over plant assets under RISA makes Aetna a fiduciary. That's the end of the analysis. But, yes, and the point of fiduciary status is to protect the plan participants and beneficiaries, not the plan sponsor or the, quote, customer. I agree with that, but the fiduciary— Go ahead. The fiduciary responsibility extends to plant assets. Aramark, as a plan fiduciary, has an obligation— There's nothing that Aramark allegedly—sorry, that Aetna allegedly did wrong that offended or hurt plan participants. It absolutely did. The allegation is that Aramark entrusted Aetna to use plant assets, which come from participants, to make decisions about how much doctors and hospitals should be paid. So I'll give you a very clean example. Somebody goes in and gets a kidney transplant, $100,000 bill, whatever the number is. Aetna says, we should pay $100,000 for that. It gets money from Aramark, including money that comes from the plan and money that comes from the plan sponsor. Those are plant assets that are delivered to Aetna, and Aetna pays the bill. The next day, Aetna says, we need another $100,000 for the same kidney transplant and gets another $100,000 from Aramark, from the plan, which includes dollars that are coming from plan beneficiaries, and makes a duplicate payment. Aetna is a fiduciary because it's made a discretionary decision about paying those bills, and it paid those bills twice. And as a fiduciary, it has not met its standard of care because it shouldn't be paying the claim twice. And Aramark, as a plan fiduciary, to protect the plan assets that are coming in from the beneficiaries, has an obligation to go get those dollars back from Aetna. That's not in your pleadings, though, is it? It is in the pleadings. Well, I know you make all these allegations about having double-charged or overcharged or took excessive fees and so on and so forth. Correct. And the example that I provided you was a simple example. We've done the analysis, and we've identified a number of different instances in which excess fees are being paid, duplicate claims are being paid. Do you know any other cases that have treated this relationship as a fiduciary relationship as opposed to an agency or contract relationship? I can give you the Sixth Circuit and the Tierra Yachts case, which came out last week. I apologize. I do not have the citation for you. I can give that to you. What case? The Tierra Yachts case against Blue Cross. I will send it to you. I did not know we were going to be arguing this point. But I can also tell you that in the Group 1 case, Aetna has taken the position that it was a fiduciary. And it used— We're not—you know, they're entitled to do what they want to do. So that's not the point here. I don't think that's relevant. There are many cases in which TPAs, which is the capacity that Aetna is acting in, and when it administers plans, have found that the TPA, whether it's Aetna or any of the other health insurance companies, are a risk of fiduciaries. Well, I know they're fiduciaries vis-à-vis the participants. I did not know. I've not seen a case where it was a fiduciary simply because it was managing the assets that Aramark was giving to it. I would be happy to provide the Court with a list of those cases. Like I said, the Sixth Circuit last week addressed this very specifically. So from our perspective, Aetna is a fiduciary. And the claims here are that Aetna, acting as a fiduciary, breached its fiduciary obligations. And what we see from Amara and these other cases is that when the claim is for breach of fiduciary duty under ERISA against a fiduciary, the proper remedy there is a make-whole remedy. And these are the type of claims, and then this is from Amara, and it's been followed by every circuit that's addressed this since Amara except for the Fourth Circuit, has decided that these make-whole remedies are equitable remedies, and that's what we're pursuing here. And I do think that it's important to be able to refer to the Group 1 case here because it was the exact same arbitration clause that was applicable there. And this is at page 131 of the record on appeal, which is the final award in Group 1. So applying the exact same language that we have before us here, Aetna took the position, Aetna asserts the relief sought is surcharge, which is exclusively equitable remedy, which requires a trustee to restore assets lost due to the trustee's alleged mismanagement of trust funds. And the section provides for personal liability against a fiduciary to make good to such plan any losses to the plan resulting from each such breach. But we're not bound by that case, so you've got to argue from first principles, please. I completely agree that you're not bound by that case. But I do think it informs the interpretation because what you heard Aetna say here is that the arbitration clause should be interpreted differently now than it did in an interpretation that it took after. Move on to something else. You hammered that into the ground. There are a lot of good arguments you have, but I haven't heard them all. So the make-whole remedy makes sense. And my opposing counsel cited the loss provision that appears in our prayer. That loss provision tracks Section 1109A of ERISA. It's artfully pleaded. No question about it. And it tracks. And it's because the decision under ERISA, the policy there, is that if you have a fiduciary, and if you have a fiduciary who breaches, then the plaintiff, the aggrieved party, is going to be made whole. Otherwise, you run into the possibility that the fiduciary will be unjustly enriched by its breach. Are you asking for a jury trial? No. Just wondering, why did you pick the Eastern District of Texas Marshal Division to file? Because most of Airmark's employees reside in Texas, and most of the harm occurred here. And the Eastern District of Texas is the fastest court to trial. Actually, there are several other fast courts. There are. I do not disagree with that. Well, it's pretty clear why you go to Marshall, Texas. I mean, that's the real world. Fast to trial. So I want to talk about the arbitrability question a little bit. We believe that Archer controls here. There's not a presumption in favor of arbitrability. There is a presumption under the Federal Arbitration Act that determinations of arbitrability are going to be made by the court, unless there's clear and unmistakable evidence that a delegation occurred. And what you have here is you have competing interpretations of what is at best an ambiguous clause, an ambiguous contract. Our view is that the basic grammar rules, basic contract interpretation rules, require controversy and claims to modify the equitable relief. And to the extent that there are claims that are being brought that seek equitable relief, which is the only thing that we seek here, those are clearly outside the scope of the arbitration clause. And Archer? Let me ask you, if we interpret it, you've got controversy and claims. If we interpret it that only the relief is not subject to an arbitrator's decision on arbitrability, does this go on two tracks? Does arbitration deal with the merits, but if it gets to where there's money damages, where there's something else that ends up being equitable relief, how do you get the court back involved? So the distinction that you're drawing, I think, is a possibility, but I don't think it makes sense under this particular rule. I don't think it does make sense, and that's why I'm asking you about it. It does seem to me that, I mean, part of the arguments about the difference between remedies and difference between actions and disputes in Archer and what we may have here, but it does seem to me that the arguments may be on both sides, almost leading to a bifurcation in interpreting some of these provisions, and I don't understand how that would work. So you're saying that's not what you have in mind? Well, what I'm saying is the lack of understanding is at best an ambiguity, and so for purposes of the threshold question of determining who determines arbitrability, the conclusion that you have to reach is that that delegation is not clear and unmistakable, because there are these ambiguities, there are these questions. And so for the threshold question, that, I think, is as far as the panel would need to go. But it wasn't ambiguous in Schein, which is the case that you're principally relying on, so how can it be ambiguous here but not in Schein? So I think we're primarily relying on Archer. I don't think we're primarily relying on Schein. I thought that was Schein. Archer stands for the proposition that— Archer and White v. Henry Schein, Inc. Oh, I apologize. Yes, we're primarily relying on Archer. I was referring to it by the first name.   So in Archer, you have the carve-out clause, and the Fifth Circuit held that because the carve-out clause existed in the same sentence, there was no presumption of the delegation of arbitrability, and that's the exact same situation that we have here. Here you have—and I know this is subject to dispute, but, A, it says relief, not claims, and there's a difference because, as you just said, you squarely asked for make-whole relief, not money damages. So that makes a difference, number one. And number two, there's the extra sentence about under no circumstances, only compensatory damages. So my view, our view, is that it does refer to relief, but it refers to claims and controversies that seek equitable relief. That's the proper grammatical interpretation. The sentence at the end is completely self-contained and doesn't address this. It relates exclusively to monetary damages, and if you look at the sentence, all it's doing is constraining what monetary damage is. Compensatory. Correct. Punitive. Not punitive. You're going to ask for punitive. I'm not going to ask for punitive. Maybe not. Not yet. I will not ask for punitive under the claims that we have pleaded, Your Honor. And so the last sentence, I don't think, informs the conversation. Of course it does because it's part of the extent to which the arbitrator has authority. Right. A situation where under the AAA, the arbitrator can otherwise do whatever he wants. Right. And if you look at the language, it's only referring to monetary relief. It's not referring to any other kind of relief. The two sentences are self-contained. So you have monetary relief and you have equitable relief. Correct. They fit together. Well, they fit together, but they don't fit together in terms of who decides arbitrability. And then in terms of the last point, we do not think that Judge Gielstrap erred. He made a decision based on a motion under Federal Arbitration Act Section 3, a motion to stay. And Aetna put that motion in front of him. He had an obligation to address it. And one of the obligations that he had under Section 3 is to satisfy himself that the claims were, in fact, arbitrable. And that's what he did applying Fifth Circuit precedent. How do you apply Montanile? So Montanile, I think, does not apply here because it's a subrogation claim. It's a contractual claim that was being brought. Well, so were several of these other claims. Amara distinguished the other subrogation claims. Correct. And those are not equitable claims. You have contractual claims. The Montanile doesn't say anything about being distinguished based on subrogation. But I think that's the distinction that we have to draw, and it's the distinction that the courts that have applied Amara as opposed to Montanile. Again, Amara, what was that? That was eight members of the court, it seems to me, six to two maybe. This is eight to one. I mean, it must mean something because it's fairly expansively reasoned as well about the differences between equitable and legal relief. But it's talking about equitable in the context of a specific remedy that's not being sought here and that's not necessarily provided for a breach of fiduciary duty claim under ERISA. It's talking about applying equitable lien concepts as a remedy, not as a claim, as a remedy against specific funds. And that's not the situation that we have here, and Montanile doesn't take into it. Montanile says in Mertens, we applied this distinction, law and equity, to a claim seeking money damages brought by a beneficiary against a private firm that provided a trustee with actuarial services. We found that the plaintiff sought nothing other than a compensatory damages, and I stand corrected, against a non-fiduciary. Such a claim, traditionally speaking, was legal, not equitable. I'm going to look into it more. And I would infer — Let me ask you before we leave Judge Jones' point, if you could add to it. Footnote 3 is actually obviously the problem for you. I think it very clearly says whatever Mertens, Great West, and Siraboff say is the law. And if those are not fiduciary cases, you may be on to something. If some of those are fiduciary cases, it does seem to me, after sort of giving the back of the hand to Amara, which then said, here's the law, and we restate it. And I don't know if you're going to stay off the top of your head, but I'll be looking at them. I mean, the footnote does say sort of at the end that Mertens and these other two cases are the law, regardless of what Amara said. And they are absolutely the law to the extent that there are claims that were brought against non-fiduciaries for monetary relief. That's absolutely true. They remain good law. But they don't address a claim for breach of fiduciary duty against a fiduciary, where there's a different calculus. And this is the discussion in Amara, and this is the discussion in the later cases, including in Gerald's, that the thing that you can't tolerate is for the fiduciary to be unjustly enriched by limiting the remedies of the harmed party. And that's not a consideration that came up in Great West or Mertens or Montanil. And that's the distinguishing factor. Unless there are more questions, I'll submit. No, sir. Thank you. All right. Mr. McCloud. Thank you, Your Honor. Maybe I can start where my colleague left off in the question of Mertens, Great West, Montanil. It is true that the parties in those cases were not fiduciaries. But all of those cases say very clearly that it doesn't matter what the status of the parties are. Great West says this, for example, at page 219, because the argument that the United States made in that case was you should analogize to these special trust law cases where there were fiduciary obligations at issue. And the Supreme Court said, quote, these trust remedies are simply inapposite. In Mertens, we rejected the claim that the special equity court powers applicable to trust define the reach of Section 502A3. And it reiterates the historical test that applies. That's the same thing the court said in Montanil. And it said that because in Montanil, as Judge Jones alluded to before, the argument the respondent was making was that AMARA was a sea change. And AMARA meant that whenever you had a sort of quasi-fiduciary relationship, the different rules that applied in the trust context are what govern the determination of whether something is equitable or legal. And that's simply not correct. I would encourage the Court to look at the opinion from this Court in Amschwand, the decision that Geralds overruled, because it goes to exactly this issue and says that the status of the parties as fiduciaries is ultimately irrelevant. But again, I think for purposes of this case, our argument right now is not that we are not a fiduciary, although we will certainly press that argument in the arbitration. It is that whether or not we are a fiduciary for purposes of these claims is not dispositive. And Montanil, again, makes that very clear. Judge Southwick, you asked a question about how this would work practically in our interpretation and whether you would have to have sort of a two-track proceeding going on with arbitration and the court. We don't think that that's likely to occur in most cases. In this case, for example, if we go to arbitration and we win and they don't get any relief, there's never an opportunity for any sort of court proceeding. And I think that's the way that it happens in the majority of these cases. We cited the Rainwater case from the Fourth Circuit, where a very similar provision was at issue. And the Fourth Circuit said that in the course of confirming the arbitration award, which you would want to do anyway, you could address these sort of remedial questions. But to the extent we are making distinctions based on such words as an archer, as actions or disputes, and then distinguishing remedies and relief, it seems like it's opening to complexity that would be unfavorable to the legal system. But whether it applies in this case or not remains to be seen. Well, in terms of the complexity, I think this is actually fairly straightforward under this Court's decision in Petrofac, which says that the incorporation of the AAA rules is a delegation that's clear and unmistakable of arbitrability questions to the arbitrator. And then the question simply becomes, is there something in this agreement that detracts from that clear and unmistakable delegation? And I don't believe that there is. The only reason Archer has come up is because Aramark has said, hey, this provision looks sort of like the provision in Archer. I don't think that's right. I think that this provision has significant textual distinctions. One is the actions, disputes language that was at issue in Archer. The other is the language about only monetary relief. And as I was explaining earlier, those provisions all reinforce the idea that the arbitrator has significant authority to resolve any controversies and claims between the parties, but there are limits on the nature of the relief that the arbitrator can award in those controversies. Well, and as far as complexity goes, it is not the plaintiff but the defendant that has an amicus brief that says that this kind of argument opens parties up to clever pleading. Exactly. And, you know, playing games with forum selection as well as interpretation of the provisions and therefore denial of arbitration. And that was going to be my last point, Your Honor, which is this was a very heavily negotiated provision. We spent months negotiating this provision with Aramark, and we wanted to make sure that we were protected and that we had the ability to go to arbitration. And through clever pleading, by characterizing their relief as equitable, by adding in a throwaway request for a preliminary injunction that they never actually pursued, they have been able to get into Marshall, Texas, instead of arbitration in Connecticut, which is what the parties agreed to. And so I think their position would encourage parties to do that sort of gamesmanship. Again, I'm not saying that's exactly what happened here, but I do think it opens the door to parties artfully pleading their way out of these heavily negotiated arbitration agreements in a way that's inconsistent with the AAA rules and inconsistent with the FAA's strong presumption in favor of arbitration. What was the point of excluding equitable relief from the arbitration clause? I think there were—well, it's not in the record, but I think there are a couple of possible answers. One is you want to preserve the ability of the parties in a truly emergent situation to go to a district court and get, for example, a TRO if they need that. The other is plan reformation is sometimes considered an equitable remedy. And if you were to have an arbitrator reform the plan in an arbitration, it would be very difficult to review that decision because of the very differential standard review that applies on appeal. And so we wanted to make sure that those sorts of very technical, complex questions could be decided in a court where we would get full appellate rights. If there are no more questions, we'd ask the Court to reverse. Thank you. Thank you. We'll be in recess until 9 o'clock tomorrow morning.